## FAIRFIELD *v.* COUNTY OF GALLATIN.

1. Where no Federal question is involved, this court will follow the construction which has been uniformly given to the Constitution or the laws of a State by its highest court.
2. Cases affirming this principle cited and examined.
3. This court accepts as binding the decision of the Supreme Court of Illinois in *Chicago & Iowa Railroad Co.* v. *Pinckney* (74 Ill. 277) and subsequent cases, construing the section of the Constitution of that State in force July 2, 1870, which provides that " no county, city, town, township, or other municipality shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to, or loan its credit in aid of, such corporation: *Provided, however,* that the adoption of this article shall not be construed as affecting the right of any such municipality to make such subscriptions where the same have been authorized, under existing laws, by a vote of the people of such municipalities prior to such adoption;" and holding that such previous donations, if sanctioned by a popular vote, under pre-existing laws, were not forbidden, but were, in like manner as subscriptions, excepted by the proviso from the general prohibitory terms of the section.
4. Where, therefore, pursuant to the authority conferred by a legislative enactment, such a donation was voted by a county in Illinois before the adoption of that Constitution, the donation may be thereafter completed by the issue of the requisite bonds.

5. *Chicago & Iowa Railroad Co.* v. *Pinckney* (*supra*) was decided before, but not reported until after, the ruling in *Town of Concord* v. *Portsmouth Savings Bank* (92 U. S. 625), involving the construction of that section, and the attention of this court was not called to it; but as it established in Illinois a rule of property which has been since maintained, the latter case, so far as it conflicts therewith, is overruled.

ERROR to the Circuit Court of the United States for the Southern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. S. M. Cullom* and *Mr. O. J. Bailey* for the plaintiff in error.

*Mr. Bluford Wilson, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

The facts of this case, so far as they are needed to exhibit the question presented by the writ of error, are very few. The defendant, on and prior to Feb. 28, 1868, was a lawfully organized and existing county of the State of Illinois, through which was located the railroad of the Illinois Southeastern Railway Company, a company incorporated on the 25th of February, 1867. The county was authorized by the legislature of the State to donate to the railroad company, as a bonus or inducement towards the building of the railroad, any sum not exceeding $100,000, and was authorized to order the clerk of the county court, or board of supervisors of the county, to issue county bonds to the amount donated, and deliver them to the company, provided that no donation exceeding $50,000 should be made until after the question of such larger donation should have been submitted to the legal voters of the county, at an election called and conducted in the usual manner. The statute further enacted, that if a majority of the ballots cast at such an election should be in favor of a donation, it should be the duty of the county court or board of supervisors to donate some amount, not less than $50,000 nor more than $100,000, to the company, and to order the issue of county bonds for the amount so donated.

On the 28th of February, 1868, in pursuance of these statutory enactments, an election of the legal voters of the county was held to determine whether the county would donate

$100,000 of its bonds in aid of the said road, and the election resulted in authorizing their issue. The bonds were accordingly issued by the county judge and county clerk, under the direction of the county court, and they were delivered to the railroad company on the 6th or 8th of October, 1870, after the conditions precedent to their delivery had been fulfilled. The plaintiff is the holder of coupons belonging to said issue, having purchased them before due, in the usual course of his business.

The defence set up is, in substance, that in consequence of a provision in the new Constitution of the State, which came into force July 2, 1870, the authority to issue and deliver the bonds had ceased to exist before the issue was made. The section of the Constitution relied upon is in the following words: " No county, city, town, township, or other municipality shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to, or loan its credit in aid of such corporation : *Provided, however*, that the adoption of this article shall not be construed as affecting the right of any such municipality to make such subscriptions, where the same have been authorized under existing laws, by a vote of the people of such municipalities, prior to such adoption."

The question presented, then, is whether a donation to a railroad company, by a county empowered by the legislature to make such a donation, when approved by a majority of the legal voters of the county at an election held for that purpose, is forbidden by this clause of the Constitution, if it was authorized under laws then existing by a vote of the people of the county prior to the adoption of the Constitution? What should be the answer to the question depends upon the construction that must be given to the section thus quoted. Are donations, thus authorized by a popular vote, within the prohibition, or are they excepted out of it by the proviso ?

In *Town of Concord* v. *Portsmouth Savings Bank* (92 U. S. 625), we had occasion to construe this section of the State Constitution. We then held that donations by counties or other municipalities to railroad companies were prohibited by

it, and that they could not lawfully be made after July 2, 1870, though they had been authorized by a prior statute and by a vote of the people of the county or municipality before the adoption of the Constitution. We were fully aware that it is the peculiar province of the Supreme Court of a State to interpret its organic law, as well as its statutes, and that it is the duty as well as the pleasure of this court to follow and adopt that court's interpretation. But we were not informed, when the case was decided, that any judicial construction had been given to the constitutional provision. It now appears that the Supreme Court of Illinois had previously considered it, and decided that donations, equally with subscriptions, if sanctioned by a popular vote before the adoption of the Constitution, are not prohibited by it, and that they are excepted from the prohibition by the proviso. This was decided by that court in 1874, more than a year before *Town of Concord* v. *Portsmouth Savings Bank* came before us; but the decision was not called to our notice, and it was not reported until 1877. It may now be found in *Chicago & Iowa Railroad Co.* v. *Pinckney*, 74 Ill. 277. The language of the court is very positive. We quote it at some length, as follows: "At the time the section of the Constitution referred to was framed, large sums of money in different parts of the State had been voted by municipalities to be subscribed and donated to railroad companies, on condition that railroads then being constructed should be completed within a given time; and the country, whether wisely and judiciously or not, seemed to demand that in cases where the people in these municipalities had, under then existing legislation, voted to aid railroads by subscription or donation prior to the adoption of the Constitution, such subscription or donation should not be affected by the formation of the Constitution. And we have no doubt it was in view of this demand of a large portion of the State that the proviso was engrafted in the foregoing section." . . . "A reasonable construction of the whole section will embrace donations as well as subscriptions. In one sense of the term, a donation is a subscription to the capital stock of a company. We have no doubt, at the time this section was framed, there were then in the State quite as many donations voted as there were subscriptions to stock in

any other manner, and if a necessity or reason existed to protect a subscription there was also the same reason and demand to protect a donation; and we entertain no doubt it was the intention of the framers of the Constitution, by adding the proviso to the section, to place subscriptions and donations on the same footing." This authoritative exposition of the meaning of the Constitution of the State by its highest court has repeatedly been recognized by that tribunal. *Town of Middleport* v. *The Ætna Life Insurance Co.*, 82 Ill. 562; *Lippincott* v. *The Town of Pana*, decided Oct. 1, 1879, not yet reported. It has also been the understanding of the legislature of the State that donations as well as subscriptions, if authorized by a vote of the people before the adoption of the Constitution, are saved by the proviso. In 1874, an act of the General Assembly was passed which declared that the liability of all counties, cities, townships, towns, or precincts that had voted aid, *donations*, or subscriptions to the capital stock of any railroad company, in conformity with the laws of the State, should cease and determine at the expiration of three years after July 1 of that year, and that after that time no bonds should be issued on account of or upon authority of such vote. This implied that up to July, 1877, donations voted before July 2, 1870, were lawful, and might be completed by the issue of bonds. It was an expression of the legislative understanding that such donations were not forbidden by the Constitution. Act of March 17, 1874. A similar act was passed on the 29th of May, 1877, extending the time for issuing bonds for donations upon the authority of a vote of the people until July 1, 1880. It thus appears to have become a rule of property in the State that municipal bonds, issued to railroad companies on account of donations voted by the people before the adoption of the Constitution, are valid, though not issued until after the adoption. Such was the earliest exposition of the Constitution, made by the court of last resort in the State, twice since recognized by it, and recognized also by repeated legislative action. There is every reason to believe that the rule has been relied upon, and that on the faith of it many municipal bonds have been issued, bought, and sold in the markets of the country.

In view of all this, ought this court to adhere to the construction we gave to the State Constitution in ignorance of the fact that the Supreme Court of the State had previously construed it in a different manner? At a very early day it was announced that in cases depending upon the Constitution or statutes of a State this court would adopt the construction of the statutes or Constitution given by the courts of the State, when that construction could be ascertained. *Polk's Lessee* v. *Wendell*, 9 Cranch, 87. In *Nesmith* v. *Sheldon* (7 How. 812), it is declared to be the "established doctrine that this court will adopt and follow the decisions of the State courts in the construction of their own Constitution and statutes, when that construction has been settled by the decisions of its highest tribunal." In *Walker* v. *State Harbor Commissioners* (17 Wall. 648), we said, "This court follows the adjudications of the highest court of the State" in the construction of its statutes. "Its interpretation is accepted as the true interpretation, whatever may be our opinion of its original soundness." See also *Elmendorf* v. *Taylor*, 10 Wheat. 152; *Green* v. *Neal's Lessee*, 6 Pet. 291; *Leffingwell* v. *Warren*, 2 Black, 599; *Sumner* v. *Hicks*, id. 532; *Olcott* v. *The Supervisors*, 16 Wall. 678; *State Railroad Tax Cases*, 92 U. S. 575.

Such has been our general rule of decision. Undoubtedly, some exceptions to it have been recognized. One of them is, that when the highest court of a State has given different constructions to its Constitution and laws, at different times, and rights have been acquired under the former construction, we have followed that, and disregarded the latter. The present case is not within that exception, for there have been no conflicting interpretations by the State court of the section of the Constitution we are now called upon to construe. And we are not constrained to refuse following the decision of the State court in order to save rights acquired on the faith of our ruling in *Town of Concord* v. *Portsmouth Savings Bank*. *Groves* v. *Slaughter* (15 Pet. 449) may seem to be an exception to the rule, but if carefully examined it will be found to be no exception. In that case, this court held that the Constitution of Mississippi did not, *ex proprio vigore*, prohibit the introduction of slaves into that State as merchandise or for sale, after the

first day of May, 1833, and, therefore, that a promissory note given for the price of slaves thus introduced was not void. This was held, though it appeared that prior to the decision the chancellor of the State had refused to enjoin a judgment at law recovered upon a bond for the purchase of slaves brought into the State for sale after May 1, 1833, and the Court of Errors, two judges against one, had affirmed the refusal of the chancellor. But the decision of the chancellor was rested entirely upon the ground that the matter relied upon to obtain the injunction should have been set up as a defence in the suit at law. This was all that was really decided. The opinions expressed in the Court of Errors by the judges upon the question whether the introduction of slaves after May 1, 1833, was prohibited by the Constitution, were extra-judicial, and were so regarded by this court. It was said they were not sufficient to justify this court in considering that the construction of the Constitution in Mississippi had become so fixed and settled as to preclude the Federal Supreme Court from regarding it as an open question. *Groves* v. *Slaughter*, therefore, is not an exception to the rule that this court will follow the construction given by the highest court of a State to its Constitution. On the contrary, the court assented to the rule.

Subsequently, the provision of the Constitution of Mississippi was brought before the courts of the State, and it was settled by the highest tribunals that it did of itself, and without any legislative enactment, prohibit the introduction of slaves as merchandise, and for sale, and render all contracts for the sale of slaves, made after May 1, 1833, illegal and void. *Rowan* v. *Runnels* (5 How. 134) then came up to this court, where the same question was presented, and the construction given by this court to the State Constitution was adhered to in order to support a contract for slaves purchased, and apparently only for that reason. Chief Justice Taney, in delivering the opinion of the court, said that in *Groves* v. *Slaughter* the court was satisfied that the validity of these sales had not been brought into question in any of the tribunals of the State until long after the contract was made, and that as late as the beginning of 1841, when *Groves* v. *Slaughter* was decided, it did not ap-

pear from any thing before the court that the construction of the clause in question had been settled either way, by judicial decision, in the courts of the State. He added: "Undoubtedly this court will always feel itself bound to respect the decisions of the State courts, and, from the time they are made, will regard them as conclusive in all cases upon the construction of their own Constitution and laws. But we ought not to give to them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other States, which, in the judgment of this court, were lawfully made."

That case is totally unlike the present. The bonds in question now were issued in October, 1870. In 1874, the highest court of the State decided that such bonds could be lawfully issued, and that they were not forbidden by the Constitution. It was, therefore, conclusively settled more than a year before *Town of Concord* v. *Portsmouth Savings Bank* was decided by us, what the meaning of the Constitution was. We are now asked to decline following the construction given and since recognized by the State court, and to adhere to that adopted by us in ignorance of the prior judgment of the State court, and that not, as in *Rowan* v. *Runnels*, to uphold contracts, but to strike them down, though they were made in accordance with the settled law of the State. We recognize the importance of the rule *stare decisis*. We recognize also the other rule, that this court will follow the decisions of State courts, giving a construction to their constitutions and laws, and more especially when those decisions have become rules of property in the States, and when contracts must have been made, or purchases in reliance upon them. And it has been held that this court will abandon its former decision construing a State statute, if the State courts have subsequently given to it a different construction. In *Green* v. *Neal's Lessee* (6 Pet. 291), the question raised was whether the court would adhere to its own decision in such a case, or would recede from it and follow the decisions of the State court. In two previous cases a certain construction had been given to a statute of Tennessee in supposed harmony with decisions of the State court. But subsequently it was decided otherwise by the State Supreme Court; and it appeared

that the decisions upon which this court had relied were made under peculiar circumstances, and were never in the State considered as fully settling the construction of the act. This court, therefore, overruled its former two decisions, and followed the later construction adopted by the State court. See also *Suydam* v. *Williamson*, 24 How. 427. With much more reason may we change our decision construing a State Constitution when no rights have been acquired under it, and when it is made to appear that before the decision was made the highest tribunal of the State had interpreted the Constitution differently, when that interpretation within the State fixed a rule of property, and has never been abandoned. In such a case, we think it our duty to follow the State courts, and adopt as the true construction that which those courts have declared.

The judgment of the Circuit Court will be reversed, and the record remitted with instructions to give judgment for the plaintiff below on the findings made; and it is

*So ordered.*